UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**GINA ANNE NOEL PANE,**
                        *Plaintiff,*

- against -

**THE TOWN OF GREENBURGH,
JOHN KAPICA, in his capacity as
CHIEF OF THE GREENBURGH
NEW YORK POLICE
DEPARTMENT,  ERIK WARD,
POLICE OFFICER MICHAEL
MUESSER, SERGEANT ROBERT
GRAMAGLIA, SERGEANT
FRANCIS PUMILLO, DETECTIVE
PAUL FERTIG, JOHN DOE POLICE
OFFICERS 1 - 10, SO NAMED AS
THEIR IDENTITIES HAVE YET TO
BE ESTABLISHED.**
                        *Defendants.*

Civil Action Number:
07 CV 3216 (WP4) (LMS)

**AFFIRMATION IN
OPPOSITION TO
DEFENDANTS' ORDER TO
SHOW CAUSE SEEKING TO
DEPOSE PLAINTIFF'S
ATTORNEY ANTONIO
CASTRO, ESQ.**

RAVI BATRA, being duly sworn, deposes and says:

1.      I am an attorney duly licensed to practice law in the Southern District

of New York, and in all Courts of the State of New York.  I am the principal of

The Law Firm of Ravi Batra, P.C., co-counsel for plaintiff Gina Anne Noel Pane

in the above entitled action.

2.      I make this Affirmation in Opposition to the Order to Show Cause of

defendants Muesser, Gramaglia, Pumillo, Fertig, and others not yet identified

1

seeking an Order permitting the defendants to conduct a deposition of Antonio
Castro, Esq., plaintiff's co-counsel.

3.    In a factual misleading Affirmation in support of an Order to Show
Cause, combined with an anemic Memorandum of Law, defendants seek an Order
compelling Antonio "Tony" Castro, Esq., to be deposed in the instant proceeding.
Critically absent from the defendants' moving papers, however, is an
acknowledgment that Tony Castro is, and has always been, a member of the
plaintiff's litigation team.  Rather, the defendants merely categorize Tony Castro
as a "non-party witness . . . who formerly represented the plaintiff in the defense of
criminal charges which arose out of her arrest by the Greenburgh Police
Department on January 21, 2006" (Def. Aff. p. 1).  Thus, on its face, the
defendants' papers wholly misrepresent the legal status of the person whom they
wish to depose.

4.    The defendants have wholly failed to overcome the "disfavored"
status of attorney depositions.  They have utterly failed to demonstrate that there is
a real need to depose Tony Castro.  Nor have they forthrightly considered or
reported Tony Castro's critical involvement as plaintiff's counsel in the instant
litigation, the duplicitous and cumulative nature of the information they purport to
seek from Tony Castro as compared to discovery already conducted, or the strong

2

risk of impinging upon issues of both privilege and work-product. Under these circumstances, the defendants' Order to Show Cause must be denied in its entirety.

## I.  **FACTUAL BACKGROUND**

### A.  *INITIAL POLICE CONTACT*

5.      On or about January 21, 2006, at approximately 9:15 P.M., the plaintiff along with physically challenged male friend were sitting in a car registered to the plaintiff's mother in a movie theater parking lot passing time before a movie, which they had already purchased tickets for, was to start. The plaintiff had parked the car head-on towards a perimeter wall, with its engine off, at which time she observed red turret lights in her rear view mirror. Shortly thereafter, the plaintiff's car was approached by defendants Muesser and Gramaglia, each members of the Greenburgh Police Department, who had blocked the plaintiff's car from the rear with their own police car.

6.      Without probable cause, or even grounds to develop anything resembling a reasonable suspicion, the police demanded to know if anything illegal was contained within the plaintiff's vehicle. The plaintiff informed the police that she had tickets for a soon to start film; however, this did not satisfy the defendants' thirst for information, and feeling trapped by the police who had

3

caused her vehicle to be surrounded on all sides, the plaintiff provided the officers with the small quantity of marijuana contained within her sealed purse.

7.      Notwithstanding that the marijuana was not burning or open to public view, and that it was seized under duress, the officers directed the plaintiff to exit her car, handcuffed her, and detained her within a police car.  At that time, without consent, or any exigent circumstance, the police searched through the plaintiff's belongings sealed in closed containers within her car.   Upon learning that play piercing needles were within one of the sealed containers, the officers inquired if Ms. Pane was a "dominatrix." The plaintiff admitted to participating in this lawful vocation on a part-time basis.  Later that evening, notwithstanding that Gina was not driving the car, she was compelled to provide a urine sample on threat of suspension of her driving privileges.

## B.    *ERIK WARD BECOMES INVOLVED*

8.      Shortly thereafter, at the behest of Greenburgh police personnel, defendants Erik Ward and Paul Fertig, both then on-duty Greenburgh police personnel, arrived and began to speak with Gina.  Defendant Ward told Gina that his police colleagues knew him to be "into," in substance, fetish sexual behavior, and thus called him to the scene. While speaking with Ms. Pane, defendant Ward told her, in substance, that he enjoyed causing women distress while he attained

4

sexual gratification for himself. Defendant Ward then offered Gina favorable

treatment on charges resulting from her police contact and faster release time from

Police Headquarters if she were to provide him with information about drug

dealers **and** assist him in achieving deviant sexual gratification.

### C.    THE GREENBURGH POLICE DEPARTMENT CONVERGES TO HARASS THE PLAINTIFF

9.    Only after this illicit overture by defendant Ward was Gina

transported by defendant Muesser to Greenburgh Police headquarters. While

driving, defendant Muesser told Gina that he attained sexual pleasure from

"spanking." Furthermore, upon arriving at police headquarters Gina was

approached by defendant Pumillo, a police supervisor, who made sexual

innuendos, including a comment that Gina must not be used to being the one in

handcuffs. Defendant Pumillo additionally asked if Gina was "wearing a 'strap-

on' or do we have to strip search you?" Thereafter, Gina was taken through the

Greenburgh police prisoner holding and processing facility within police

headquarters, wherein she was moved to various cells by different officers, and

repeatedly subjected to additional comments about fetish behavior.

10.    Defendant Ward approached Gina while she was detained and

handcuffed within the holding cells, at which time Ward repeated his previously

suggested improper *quid pro quo*.   Ward further sought Gina's Ms. Pane's

cellular telephone number as part of her "cooperation," which Gina provided

believing that Ward could help her as promised.

11.     While detained in the headquarters processing area, Gina was taken to

a fingerprinting room, wherein other officers improperly asked her about

"spanking" and "medical role play." One officer demanded that Gina spank him,

and she complied.  Furthermore, another officer took Polaroid pictures of various

parts of Gina's body and then used a cellular telephone camera to video record

Gina in a holding cell.  The Polaroid photographs were then passed around

amongst officers who each asked Gina for her website and "dominatrix-name."

While this abusive behavior was ongoing, defendant

Pumillo warned the officers that security cameras could capture their wrongdoing.

### D.    DEFENDANT WARD ABUSES HIS AUTHORITY, AND THE PLAINTIFF

12.     Prior to Gina's release from headquarters, defendant Muesser

confirmed that Ward could help Gina, and gave her a Greenburgh Police

Department business card containing defendant Ward's name and a telephone

number.  Within hours of her release, Gina received a call from defendant Ward

asking to meet later that day.   Approximately 10 hours later, after numerous

telephone calls and messages, Ward arranged to meet Gina in the parking lot of the Doral Arrowwood resort in Rye Brook, New York. Ward arrived as planned, driving a four wheel drive "Jeep" type vehicle which had a clean exterior. Gina entered the Jeep and Ward asked her to first discuss information she possessed about a narcotics dealer because, as Ward informed Gina, once he became embroiled in discussing his sexual fetishes, he would not be able to deviate from that discussion.

13.    Defendant Ward directed Gina to call a person Gina believed sold cocaine. In defendant Ward's presence, and at his insistence, Gina left a message for the cocaine dealer to call her back. This message was never responded to. Upon ending the message, Ward repeated a story about having oral sex with a woman and making her vomit. Ward then suggested that Gina and he go to a motel he used for fetish play in the Bronx, because it was away from citizens in Greenburgh who knew him and were not aware of his proclivities. Specifically, defendant Ward asked Gina to defecate on him, or in his presence. Moreover, while in Ward's vehicle, and later, Ward displayed unique parts of his body to Gina, including that most of his body hair was shaved and maintained a unique pubic hair style which resembled Adolph Hitler's moustache.

7

14.     Gina declined the suggestion of traveling to the Bronx; however she then directed Ward as he drove to wooded parkland requiring him to employ the four wheel drive function of his vehicle.  As they drove, Ward's vehicle kicked up dirt causing the exterior of the vehicle to grow muddy.  Once they reached a secluded spot, at Ward's direction, Gina defecated on the ground in the woods, defendant Ward masturbated until he ejaculated on Gina's feces; Defendant Ward then proceeded to smell Ms. Pane's soiled anus and buttocks.  While traveling back to the Doral Arrowood defendant Ward repeatedly demanded that Gina never disclose what occurred to anyone what had occurred.

### E.     THE PLAINTIFF COMPLAINS TO AUTHORITIES

15.     The next day defendant Ward attempted to contact Gina by telephone. Gina realized that something was awry, and she retained Antonio "Tony" Castro, Esq., to represent her interests.  Furthermore, on January 27, 2006, she reported the wrongdoing by Ward and other Greenburgh police personnel by confidential complaints to Internal Affairs at the Greenburgh police department, and the Public Integrity bureau of the Westchester County District Attorney's Office.  Notably, internal Greenburgh police investigators and District Attorney personnel thereafter interrogated Gina at the District Attorney's Office, without so much as informing Tony Castro that the questioning was occurring.

8

F.   *THE PRINT AND BROADCAST NEWS MEDIA ARE "LEAKED"*
     *INFORMATION ABOUT THE PLAINTIFF'S ARREST AND*
     *CONFIDENTIAL COMPLAINT AND BEGIN TO PUBLISH*
     *DETAILS OF SAME*

16.    According to information provided to me by Jonathan Bandler, a

reporter with *The Journal News* newspaper, in a telephone conversation with him

on or about April 6, 2006 at approximately 4:27 PM, on or about February 1, 2006

to February 2, 2006, an as yet unidentified source contacted Mr. Bandler and told

the reporter about the arrest of and subsequent complaint by the "dominatrix." Mr.

Bandler told me that he knew who the source of the information was; however, he

was not willing to disclose same to me. Moreover, it was these communications

that resulted in *The Journal News'* initial publication of a story by Mr. Bandler

about the plaintiff on February 3, 2006. Similarly, at or about the same time, the

News12 Westchester broadcast news cable television channel received

information about the arrest of and subsequent complaint by the "dominatrix,"

causing that TV station to run their initial story about the plaintiff on February 2,

2006. These communications were made and received by the media more than a

week after Gina's police contact and were thus "past history" devoid of any valid

claim of newsworthiness, but merely 2 days after the search warrant on Erik

Ward's home was executed only to find Ward's new computer CPU had

disappeared after he was "tipped off" about the confidential complaint and the search warrant.

17.    Moreover, the factual circumstances of Gina's arrest, albeit completely lacking in propriety, were devoid of any connection to "domination." Nevertheless, the focus of the media attention was Gina's part time vocation as a dominatrix, and the complaint against the police officers, and a media frenzy focusing on Gina began. Coverage by major television and radio stations, as well as tabloid newspapers soon followed, causing Gina to literally run from the cameras out of fear for the destruction of a future career on Wall Street, as well as to contemplate not going forward with her complaint against the officers whose behavior was laden with misconduct. Notably, the cameras of News 12 Westchester captured the image of Gina running away in panic - forever memorializing the horrendous impact upon her.

### G.    THE MEDIA ATTENTION GENERATED IN SPITE EXACERBATES THE HARM TO THE PLAINTIFF

18.    As a result of the negative media attention, which given internet technology remains available in perpetuity, Gina, the holder of a Bachelors Degree with Honors in Economics, is still unable to obtain employment in the financial sector.  Necessary background checks performed by prospective employers such

as brokerages and hedge funds reveal extensive mention of Gina's police contact,

her trumped up arrest, false claims of driving while impaired by drugs, and

directly link her to "domination." It is worth noting, that but for the rogue police

defendants' misconduct there would be no story for the media to seize upon.

## II.    THE DEFENDANTS KNOW THAT<br>THE PLAINTIFF HAS A LEGAL TEAM<br>WHICH CRITICALLY INCLUDES TONY CASTRO

19.    Importantly, the defendants are aware of Tony Castro's status in this

civil litigation as he was present for, and identified as Gina's attorney during the

examination of the plaintiff pursuant to New York General Municipal Law § 50-h

and during Court appearances before Chief Magistrate Judge Smith. It is therefore

clear that Tony Castro is not just a former attorney for the plaintiff , but instead

remains a critical member of her current group of attorneys.

20.    Notably, plaintiff's current legal team is made up of three experienced

attorneys with expertise directly related to the issues at hand. The undersigned,

lead counsel for the plaintiff, has been practicing law for more than twenty-five

years and possesses vast litigation experience in state and federal courts in a wide

array of substantive legal concentrations. Moreover, my associate Todd Sherman,

an attorney for nearly fourteen years, is a former prosecutor with extensive

litigation experience, who for more than a decade led long term investigations and

prosecutions into, *inter alia*, public and corporate corruption, police misconduct, and excessive use of force by law enforcement. Additionally, Tony Castro, who as the defendants inexplicably noted was the Westchester Democrat party's candidate for Westchester County District Attorney in both 2000 and 2004 (Def. Memo of Law at fn. 1), is a former prosecutor and accomplished litigator with extensive litigation experience, and is a recognized authority on the legal implications and forensic applications of Deoxyribonucleic acid (DNA). It is respectfully submitted that it was Tony Castro's qualifications, accomplishments and experience that caused the Democrat party to twice turn to him. Thus, each member of the plaintiff's legal team brings with them most relevant knowledge, training and experience. Moreover, Tony's background and experience certainly validates his hourly billing rate, which we respectfully submit was rather low.

### III.    THE DEFENDANTS' INSTANT MOTION

21.    The defendants opening salvo is the misleading "factual" assertions within the Affirmation of Thomas Troetti, Esq., counsel for defendants Muesser, Gramaglia, Pumillo, Fertig, and others not yet identified. By these papers, the defendants incorrectly contend that the plaintiff was the "operator of a stationary vehicle;" was "observed smoking marijuana;" she informed the police that she as a 'dominatrix' while detained at police headquarters as part of her

"pedigree;" and, that her meeting with defendant Eric Ward was to "cultivate her as a confidential drug informant"

22.    As borne out by the results in the Greenburgh Town Justice Court, the plaintiff was not "operating" a vehicle nor was she "observed smoking marijuana." Furthermore, the plaintiff was questioned about being a dominatrix at the scene of her unlawful arrest - prior to being taken to police headquarters. Moreover, and quite critically, defendant Ward's claims of cultivating the plaintiff as a "confidential drug informant" were debunked as a cover-up story in disciplinary proceedings that resulted in his termination from the defendant Greenburgh Police Department. Defendant Ward was shown to have breached the entirety of Greenburgh protocol for the "cultivation" of confidential informants. Moreover, the evidence obtained and used by Greenburgh Internal Affairs and the Westchester District Attorney confirmed the plaintiff's version of events in that third-party video recordings evidenced her meeting with Ward, exactly as Gina described, outside the scope of Greenburgh police guidelines; Ward's personal vehicle contained evidence of soil and earth consistent with the parkland described by the plaintiff; and, there was fecal matter recovered from the wooden parkland described by the plaintiff.

23.     Notably, further evidence of the defendants' ignoring critical facts, as they did with Tony Castro's status as current counsel to the plaintiff, is their failure to mention Ward's misconduct based termination from the police department - after a full hearing.   Moreover, that the Westchester District Attorney dismissed all charges associated with defendant Muesser's spurious claims that the plaintiff was operating a motor vehicle while impaired;[1] and, in essence dismissed the remaining criminal charges against the plaintiff, was disingenuously buried in a footnote within counsel's Affirmation (Troetti Aff.  fn. 2).

24.     The defendants, in an effort to misdirect this Court's search for truth, baselessly argue that notwithstanding the vast damage to the plaintiff resulting from widespread media attention to her arrest and exposure of her subsequent private complaint to Internal Affairs and the District Attorney, along with

---

[1]In New York, for purposes of charging and prosecution of Driving While Ability Impaired by Drugs, the Criminal Jury Instructions provide that:

> To operate a motor vehicle means to drive it. . . A person also operates a  motor vehicle when such person is sitting behind the wheel of a motor vehicle for the purpose of placing the vehicle in motion, and when the motor vehicle is moving, or even if it is not moving, the engine is running.

(CJI2d[NY] VTL § 1192[4]).  Thus, it is clear that there was no credible evidence to support the defendants' false assertion that Gina was "operating" a vehicle, even under New York's  broad definition of "operate."

widespread publication of plaintiff's unorthodox part-time work in "domination"
(which was wholly unrelated to circumstances of her arrest - even if the fallacious
charges against her were true) and Tony Castro having been quoted in the news
media as plaintiff's attorney, "it appears that Mr. Castro was the source of the very
information." Thus, the defendants' argument is that if you are interviewed by the
news media, you are necessarily the "source" of the story. Therefore, on a
"hunch,"that the annexed affidavit of Tony Castro debunks in its entirety,
combined with illogical reasoning, the defendants' seek to impinge on the trusting
relationship between attorney and client. Such misguided advocacy must not be
countenanced.

25.     As established in the annexed affidavit of Tony Castro, he was not the
source of the information provided to the media. Rather, he responded to media
inquiry in an attempt to soften the blow to the plaintiff - as he was bound to do as
Gina's attorney.

26.     Importantly, the very first newspaper article published by *The Journal
News* establishes that Tony Castro is not the source. In this article, annexed hereto
as Exhibit 1, Tony Castro is named by Bandler, who wrote:

> Castro declined to comment about the case, but confirmed that his client
> had made a complaint and that it was being investigated by town police
> and Westchester prosecutors.

15

(Ex. 1, col. 2). It is thus beyond cavil that Tony Castro is not, and could not be the source.

27.    Notably, the universe of people who had access to the fact that the plaintiff had filed an internal affairs complaint would have been limited to a highly restricted grouping within the Greenburgh Police Department. The same holds true for the plaintiff's complaint with the Public Integrity bureau of the Westchester County District Attorney's Office.

28.    The only way to successfully conduct a confidential internal investigation is to avoid broadcasting its existence. Nevertheless, in a brazen scheme to deter the investigation from going anywhere, that is exactly what was done here. In a malicious attempt to intimidate the plaintiff, while simultaneously seeking to discredit her, somebody with access to information confidentially provided to the police and prosecutors was "leaked" to the media. We submit that the source, whether directly, or through a third party intermediary, necessarily was someone with access to the confidential complaint made with the Greenburgh Police Department. There is simply no other possibility. However, as the plaintiff gets closer to finding out the source, the defendants, as they have in the past, have resorted to attempts to thwart the search for truth.

29.     The defendants attempts to needlessly interfere with, and intrude upon, the longstanding attorney/client relationship between the plaintiff and Tony Castro is akin to their dissemination of confidential information to the media in an attempt to harass her to the point where going forward would become too painful. There is no doubt that this is the defendants game plan, and it must not be permitted to continue.  The entire basis for the defendants' bald desire to depose Tony Castro reeks of harassment, borders on frivolous, and is indicative of a colossal "fishing expedition."

30.     Moreover, casting significant doubt as to their own belief of their claims of Tony Castro as "source," the defendants alternatively argue that even if Tony Castro was not the "source" of the damaging information fed to the news media, because he was interviewed he is therefore part of the plaintiff's damage. To adopt the defendants' argument would be to necessarily damn the entire fields of "damage control" and "public relations."  Moreover, if the defendants' contentions were to be accepted, this Court would essentially be ruling that an attorney must remain silent as his client is being muddied in the press.  This, we submit, is wholly unreasonable, and reveals the frivolity associated with the defendants' position.

31.    Rather, as the plaintiff's attorney, Tony Castro was duty bound to zealously represent her interests. See e.g. 22 NYCRR § 1200.32(a)(1)[DR 7-101] ("[a] lawyer shall not intentionally: Fail to seek the lawful objectives of the client through reasonably available means permitted by law and the disciplinary rules"). Once the media advised Tony Castro that they had information about the plaintiff, to wit: that: a) she had been arrested, b) she was involved in "domination;" and, c) she had filed a police misconduct complaint; and, that the media intended to run a story about that information, Tony Castro rightfully provided armor to protect his client.  Essentially the defendants posit that an attorney who "runs interference" with the media on behalf of his client necessarily opens himself up to adversarial interrogation.  This position is at best misguided, particularly, when, as here, Erik Ward's false denials were based upon being "tipped off" to the search warrant to get rid of his fetish website history impartially recorded in his CPU, and waiting for DNA results to come back, before even uttering a denial of DNA evidence - an amazing "smoking gun" of Ward's guilt; for surely absent his ejaculation in the woods, there could never have been any DNA of his to be found in any lab test.

32.    The defendants further attempt to "back door" their way into an interrogation of Gina's attorney by misrepresenting the totality of deposition testimony and documentary evidence provided by Gina's mother (Troetti Aff. p. 5;

18

Def. Memo of Law at pp. 4, 6).  In essence, the defendants' suggest to the Court

that: a) Gina's parents paid Tony Castro for his services rendered on behalf of

Gina; b) the plaintiff may only pursue a claim to recover fees incurred by herself,

and not her parents (a claim made without supporting citation); and, c) therefore

that the defendants' should be permitted to depose Tony Castro about the

"'conditions of [his] employment' and the amount of his fees which she has paid,

or he will seek to have her pay. . ." (Def. Memo of Law at p. 6).

33.    The inferences made by the defendants about their supposed need to

impinge on the past and present attorney/client relationship which exists between

Gina and Tony Castro were totally debunked at the very deposition of Gina's

mother, Adelle Pane, that the defendants referenced (Troetti Aff. p. 5).

Specifically, under questioning by Mr. Troetti, the attorney for all of the moving

defendants in the instant Order to Show Cause, on November 7, 2007 Adelle Pane

testified in pertinent part:

> Mr. Troetti: To your knowledge, has Gina paid any sum for legal
> services rendered to her in defense of the criminal case?
> A. Pane:      She's reimbursed myself.
> Mr. Troetti: Okay.  When did she reimburse you?
> A. Pane:      A little bit of a paycheck every month until it was paid.
> Mr. Troetti: Okay.  And to date, how much has she reimbursed you?
> A. Pane:      The total amount, $6,000.

(Adelle Pane Dep. Tr. p. 215, lines 1-10).[2] Furthermore, nearly one week later,

also under questioning by Mr. Troetti, Mr. Pane testified in pertinent part:

| | |
|---|---|
| Mr. Troetti: | Okay.  Have you paid any of Gina's legal bills relating to her criminal case? |
| E. Pane: | I paid, and she's repaid me. |
| Mr. Troetti: | All right.  And how much have you paid in legal bills – |
| E. Pane: | I think it was 6,000. |
| Mr. Troetti: | – incurred by her for the legal services rendered to her in connection with her criminal case? |
| E. Pane: | 6,000. |
| Mr. Troetti: | Okay.  And how much has she repaid you? |
| E. Pane: | All of it. |

(Eugene Pane Dep. Tr. p. 17, lines 20-24 to p. 18, lines 1-7).  Copies of the

pertinent parts of the transcript of Adelle Pane's deposition are annexed hereto as

Exhibit 2.  Similarly, pertinent parts of Eugene Pane's deposition transcript are

annexed hereto as Exhibit 3.

34.    During Adelle Pane's testimony she revealed that the funds for Gina's

criminal defense were initially laid out by her and Gina's father Eugene Pane, and

that thereafter, Gina reimbursed these payments in full.  Furthermore, the same

inquiry was made of Gina's father during his deposition, and Mr. Pane similarly

---

[2]Importantly, it was also revealed at that deposition that the defendants counsel, via their subpoenas to Gina's parents, caused Adelle Pane to seek, obtain, and produce an invoice issued to Gina by Tony Castro which contained privileged accounts of legal services rendered to Gina (Adelle Pane Dep. Tr. p. 209, line 5 to p. 211, line 2).  See e.g. DiBella v. Hopkins, 403 F.3d 102 (2nd Cir. 2005).

informed the defendants that Gina had paid back the fees advanced to Tony Castro in full.

35.     Moreover, in their quest to send this Court on a "red herring" laden "wild goose chase," the defendants have inferred that there is a question as to which fees have been paid to Tony Castro.  In essence, the defendants disingenuously question the amount of the fees, and whether the fees already paid were "related to [Gina's] defense of the criminal charges for which she was arrested" (Def. Memo of Law at pp. 5-6).  What the defendants completely failed to advise this Court was that they have already explored this very issue with Adelle Pane, at which time they were provided sworn testimony,  under questioning by Mr. Troetti, the moving defendants' attorney, that only portions of Tony Castro's invoice that were paid thus far were directly related to his representation of Gina to defeat the criminal charges (Adelle Pane Tr. p. 452, line 3 - p. 453, line 16).  Therefore, at the time that the defendants presented their Order to Show Cause to this Court, they already knew that Tony Castro had not been paid for time spent dealing with the media, or for the instant § 1983 case.

36.     Thus, the suggestion that anyone other than Gina ultimately paid the fees has already been answered by the people in the best position to know the answer.  Similarly, the same holds true for what has been paid for, and what

remains outstanding.  Contrary to the defendants' inferences of requiring Tony

Castro's testimony, he would have no independent means of knowing the

mechanics of Gina's repayment of her parents.  That was clearly an internal family

matter that the defendants have had an opportunity to explore with both of Gina's

parents.  The questions have been asked, and the questions have been answered.

There is no relevant information that could come from Tony Castro on this issue.

## IV.    THE INTRUSIVE AND UNNECESSARILY RELIEF SOUGHT BY THE DEFENDANTS' ORDER TO SHOW CAUSE MUST BE DENIED

37.    Conducting depositions of opposing counsel is a practice which is

"disfavored."  United States v. Yonkers Bd. of Educ., 946 F.2d 180 (2nd Cir.1991).

Moreover upon review of the facts and circumstances as they exist here, including

a consideration of

> the need to depose the lawyer, the lawyer's role in connection with
> the matter on which discovery is sought and in relation to the pending
> litigation, the risk of encountering privilege and work product issues,
> and the extent of discovery already conducted[,]

this Court must find that "the proposed deposition would entail an inappropriate

burden or hardship." In re Subpoena Issued to Dennis Friedman, 350 F.3d 65 (2nd

Cir. 2003).  Therefore, the defendants Order to Show Cause should be denied in its

entirety.

WHEREFORE, it is respectfully requested that the defendants' Order to

Show Cause be denied in its entirety.

Dated: New York, New York
       February 20, 2008

                        Respectfully submitted,
                        THE LAW FIRM OF RAVI BATRA, P.C.
                        *Co-Counsel for Plaintiff*

                        _____
                        Ravi Batra, Esq. (RB 4299)
                        Todd B. Sherman, Esq. (TS 4031)
                        The Batra Building
                        142 Lexington Avenue
                        New York, New York 10016
                        (212) 545-1993

Antonio D. Castro, Esq. (AC 0894)
*Co-Counsel for Plaintiff*
211 South Ridge Street
Rye Brook, NY 10573
(914) 939-0002

To:
Thomas J. Troetti, Esq.
*Attorney for defendants Muesser, Gramaglia,*
*Pumillo, Fertig and John Does 1-10*
305 Old Tarrytown Road
White Plains, NY 10603
(914) 946-1875

Brian D. Murphy, Esq.
Stecich Murphy & Lammers, LLP
*Attorneys for defendants Town of Greenburgh and John Kapica*
828 South Broadway, Suite 201
Tarrytown, NY 10591-6650
(914) 674-4100

Andrew C. Quinn, Esq.
Quinn & Mellea, L.L.P.
*Attorneys for defendant Erik Ward*
Crosswest Office Center
399 Knolwood Road, Suite 220
White Plains, NY 10603
(914) 997-0555

\pane.696\022008TroettiOSCAffinOp

Docket No.   07 CV 3216 (WP4) (LMS)

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

**GINA ANNE NOEL PANE,**
*Plaintiff,*

- against -

**THE TOWN OF GREENBURGH,
JOHN KAPICA, in his capacity as CHIEF OF THE GREENBURGH
NEW YORK POLICE DEPARTMENT,  ERIK WARD, POLICE OFFICER
MICHAEL MUESSER, SERGEANT ROBERT GRAMAGLIA, SERGEANT
FRANCIS PUMILLO, DETECTIVE PAUL FERTIG,
JOHN DOE POLICE OFFICERS 1 - 10, SO NAMED AS THEIR
IDENTITIES HAVE YET TO BE ESTABLISHED.**
*Defendants.*

## AFFIRMATION IN OPPOSITION TO
## DEFENDANTS' ORDER TO SHOW CAUSE
## SEEKING TO DEPOSE PLAINTIFF'S ATTORNEY
## ANTONIO CASTRO, ESQ.

THE LAW FIRM OF RAVI BATRA, P.C.
*Co-Counsel for Plaintiff*
The Batra Building
142 Lexington Avenue
New York, NY 10016
(212)545-1993
\pane.696\022008TroettiOSCAffinOp

25